UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | No. 1:23-cr-293-1 (ACR) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **JENNIFER ECHEVERRIA FLORES,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its Memorandum in Aid of Sentencing.

On December 14, 2023, the Defendant, Jennifer Echeverria Flores, pleaded guilty to Count One of the Indictment, charging her with Conspiracy to Distribute and Possess with Intent to Distribute More Than 400 Grams of Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(vi). Pursuant to the terms of the Plea Agreement, Defendant Echeverria Flores admitted to selling more than 4,500 blue pills marked with "M" on one side and "30" on the other that contained varying concentrations of fentanyl. Both the Plea Agreement and the PSR calculate that the Defendant's Estimated Guidelines Range for Count One is 46 to 57 months' imprisonment. *See* ECF No. 35, Final Presentence Investigation Report ("PSR") ¶ 92. For the reasons herein, and based on the 18 U.S.C. § 3553(a) factors, the United States requests that the Court sentence the Defendant to a period of 54 months' incarceration. Furthermore, despite the Defendant's unlawful presence in the United States and the applicability of USSG § 5D1.1(b), a term of supervised release of five years is statutorily mandated. *See* 18 U.S.C. § 841(b)(1)(A)(vi).

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

In February 2023, the Drug Enforcement Administration ("DEA") initiated an investigation into the Defendant based on a tip that she was distributing fentanyl. Between February 17, 2023, and July 19, 2023, through undercover ("UC") controlled purchases, DEA agents purchased a total of approximately 4,500 pills containing fentanyl from the Defendant in Washington, DC, and Maryland. The pills are blue, marked "M" on one side, and "30" on the other, to mimic legitimate 30 milligram oxycodone pills. However, the Defendant knew that these pills were not what they appeared to be: she told the UC the pills had "fent" in them. More than half of these pills contained more than what DEA estimates is a lethal concentration of fentanyl, 2 milligrams per pill[1]; one batch of these pills was almost twice that concentration at 3.7 milligrams per pill. In total, the Defendant received more than $19,000 through these five transactions.

The charged transactions were only a fraction of the Defendant's conduct during the pendency of the charged conspiracy, as the Defendant's own statements during this period evince her having a large number of customers other than the UC. For instance, during the February 17, 2023 controlled purchase, the Defendant indicated that she had to go because other customers were waiting for her. Similarly, during the March 16, 2023 controlled purchase, the Defendant mentioned that she had five people waiting to meet her.

On July 31, 2023, DEA agents arrived at the Defendant's residence to arrest her. Her mother and a DEA agent both informed her of the warrant seeking her arrest. Despite stating over the phone that she would return home, she did not. Instead, she continued about her drug dealing by coordinating with the UC to sell him 2,000 fentanyl pills and then arranged the meeting, where she was ultimately arrested.

---

[1] DEA, Facts about Fentanyl, April 2021, available at https://www.dea.gov/resources/facts-about-fentanyl.

**II.     DISCUSSION AND SENTENCING RECOMMENDATION**

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 128 S. Ct. 586, 596 (2007). These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a).

The United States recommends that the Court sentence the Defendant to a term of 54 months' (4.5 years) incarceration, which is consistent with the parties' plea agreement and the Guidelines' computation articulated in the Final PSR, *see* PSR ¶¶ 92, 97, followed by five years of supervised release. Under the totality of circumstances, including the nature and seriousness of the Defendant's conduct and her history and characteristics, the United States submits that such a sentence of incarceration serves the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

   A.     **Nature And Circumstances of The Offense**

As described in detail in the Factual Background, the nature and circumstances of the Defendant's offenses warrant a significant sentence. As part of the charged conduct, the Defendant contributed to a devastating fentanyl crisis in the District of Columbia and Maryland.

The danger of fentanyl cannot be overstated. By far, it is the most dangerous and deadly narcotic being illegally sold in modern history. Fentanyl is "approximately 100 times more potent

than morphine and 50 times more potent than heroin as an analgesic."[2] According to the DEA, only two milligrams of fentanyl is considered a potentially lethal dose; and here, more than half of the pills Defendant sold to the UC contained at least a concentration of two milligrams, with one batch of 1,000 pills containing *almost double that concentration* (3.7 milligrams/pill).[3]

2023 was a tragically record-breaking year for overdose deaths in the United States: for the first time in United States history, fatal overdoses passed 112,000 deaths, largely driven by fentanyl. *See In 2023 fentanyl overdoses ravaged the U.S. and fueled a new culture war fight*, NPR, December 28, 2023, available at https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction. This national trend has had a devastating impact in this District: a May 2023 report prepared by the DC Office of the Chief Medical Examiner highlighted that in 2016 62% of the 233 opioid overdose deaths were attributable to fentanyl or an analog, and in 2022 an overwhelming 97% of the 458 such deaths were attributable to fentanyl or an analog. *Opioid-related Fatal Overdoses: January 1, 2017, to February 28, 2023*, DC OCME, May 16, 2023, https://ocme.dc.gov/sites/default/files/dc/sites/ocme/agency_content/Opioid%20related%20Overdoses%20Deaths_May2023.pdf. This startling trend held despite DEA Washington Division (covering DC, Maryland, and Virginia) reporting a 250% increase in seizures of fentanyl pills in 2023, constituting 6.1 million potentially deadly doses and more than 500,000 pills. Howard

---

[2] DEA Drug Fact Sheet, October 2022, https://www.getsmartaboutdrugs.gov/sites/default/files/2022-11/Fentanyl%202022%20Drug%20 Fact %20Sheet_1.pdf.

[3] This wide fluctuation in concentration levels is one factor that makes fake pills containing fentanyl so dangerous. A drug user may consume one pill that contains significantly less fentanyl thinking that it is safe to take another; however, if the second pill contains nearly double the amount of the first pill (or double the dose that the user is accustomed to), an overdose resulting in death might result. *See, e.g.*, Ashley Larnder, et al., *Variability in the unregulated opioid market in the context of extreme rates of overdose*, 235 Drug and Alcohol Dependence 109427 (June 1, 2022), available at https://www.sciencedirect.com/science/article/pii/S0376871622001648 ("The opioid crisis was found to be more attributable to the constant risk of variability within drugs than to the occasional bad batch.").

University Hospital reports that the District has close to 400 opioid related deaths per year – contributing to the third highest opioid mortality rate in the country with 34.7 deaths per 100,000 persons compared to the national average of 14.6 deaths. Older Black Americans are disproportionately represented in this harrowing statistic.[4]

The fentanyl crisis is so serious that deaths due to fentanyl in the District of Columbia outnumber homicides: in 2023, there were 525 overdose deaths, overwhelmingly attributable to fentanyl, while there were 272 homicides. Thankfully, due to Naloxene, many lives are now regularly saved when someone has a fentanyl overdose; however, as the Chart below indicates, 2,898 individuals were administered Naloxone, which probably saved their lives. Even scarier, the DEA believes that the use of Naloxene is vastly underreported, which means that the number of people actually suffering fentanyl overdoses is most likely significantly higher.



---

[4] In the District of Columbia, 84% of opioid overdose deaths are of Black Americans and 75% of all fatal opioid overdoses between 2016 and 2020 were in adults between 40 and 69 years old. *See* https://livelong.dc.gov/page/about-live-long-dc.

5

And while fentanyl is disproportionately affecting older, African Americans in DC, it has also invaded youth populations in other areas. For example, in Montgomery County, Maryland, the Washington Post reports that "Youth overdoses — which include those by people under the age of 21 — spiked in the D.C. suburb in 2022, rising 77 percent. There were 48 youth overdoses last year, 11 of which were fatal, according to data from the Montgomery County Police Department. In 2021, there were 27 reported youth overdoses; five were fatal." Washington Post, January 21, 2023, available at https://www.washingtonpost.com/education/2023/01/21/youth-overdoses-opioids-fentanyl-montgomery-county.

By now, the dangers of fentanyl are well known. Anyone distributing these fake blue M-30 pills knows that they are not legitimate, contain fentanyl, and have the serious potential to cause death. Despite this, the Defendant demonstrated a callous indifference to human life in distributing a drug that appears to be legitimately manufactured oxycodone to maximize her profits. The variation in fentanyl concentration between the different batches of pills sold to the UC further demonstrates the dangerousness of the unregulated production of these pills. Every time an individual consumes one of these pills, they are essentially playing Russian roulette, not knowing whether the pill contains a lethal or non-lethal dosage. Even an experienced user could overdose if doubling up after a weak dose from one batch. While law enforcement has not identified a victim of the Defendant's fentanyl distribution, it is incontrovertible that her distribution of thousands of fentanyl pills caused significant harm to the community. At minimum, her widespread distribution of a significant number of pills caused human suffering and addiction, as further discussed below.

B. **History and Characteristics**

Notably, the Defendant does not have any prior arrests or convictions. However, there are several concerning facts in the Defendant's history and characteristics, which the Government asks the Court take into account.

First, the Defendant was legitimately employed during the period of the conspiracy. She was afforded opportunities while growing up in the United States: she got her GED in 2018 and in 2019 received her nursing assistant (CNA) certification and flagger certification from American Traffic Safety Services (ATSSA). PSR ¶ 72. When interviewed by Probation, she reported continuous employment since 2016, including most recently working for her mother's floral business from 2022 until she was arrested in July 2023. PSR ¶ 73-83.

Therefore, when the charged offenses are put in the context of the Defendant's work history and steady employment during the period of the conspiracy, it becomes clear that this was not a crime of desperation, but one of greed. This is further supported by the Defendant's own statements: after learning law enforcement was seeking her arrest, the Defendant reflected on the charged offenses in a text message she sent to a friend, observing that "I have other incomes," and "I was just getting greedy and it did me no good."

Second, the Defendant's relentless pursuit of profits in the face of the grave harms of fentanyl is further exacerbated by her intimate, firsthand familiarity with these harms. In her interview with Probation, the Defendant detailed the abuse she suffered between 2021 and 2023 by a boyfriend who was addicted to fentanyl. PSR ¶ 59. She also reported habitual use of fentanyl herself between 2020 and early 2022, when she ceased using it entirely. PSR ¶ 68. After these experiences with fentanyl caused the Defendant to recognize the devastating impact of addiction on those who suffer from it and insulate herself from those effects, she then sought to line her

pockets with profits built upon that suffering. As discussed above, the facts support and the Defendant concedes that she knew she was selling pills containing fentanyl despite their appearance as legitimate prescription medication. The Defendant's actions certainly contributed to others in her community suffering the way she has, and throughout the charged conspiracy she disregarded that time and time again in pursuit of her own financial gain.

Lastly, her actions on July 31, 2023, in evading law enforcement and trying to continue to sell 2,000 more of these pills despite knowing law enforcement sought her arrest, speak to a lack of remorse for the charged offenses and a brazen disregard for the law.

C. **The Need For The Sentence To Be Imposed**

Under the totality of the circumstances, a 54-month sentence of incarceration serves the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a). Ordinarily, a conviction for this quantity of fentanyl (400 grams or more) carries a mandatory-minimum sentence of 10 years of incarceration. While the adjustments to the Defendant's guidelines entitle her to a significantly lower sentence than that, the 10-year baseline emphasizes the gravity of the offense of conviction and supports a significant sentence of incarceration. The United States credits the Defendant's timely acceptance of responsibility in this case, but also recognizes that a 54-month sentence reflects the seriousness and dangerousness of her conduct. As discussed above, the Defendant's charged conduct has contributed to grave harm in Washington, DC, and a 54-month sentence appropriately accounts for that harm.

### III. CONCLUSION

For the foregoing reasons, the United States recommends that the Defendant, Jennifer Echeverria Flores, be sentenced to 54 months' incarceration to be followed by a term of five years' supervised release.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   /s/ *Gaelin Bernstein*
GAELIN BERNSTEIN
N.Y. Bar No. 6081079
Trial Attorney
United States Attorney's Office
601 D. Street NW
Washington, D.C.  20530
(202) 252-6743
Gaelin.Bernstein2@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2024, I caused a copy of the foregoing to be served on counsel of record via electronic filing.

/s/ *Gaelin Bernstein*
GAELIN BERNSTEIN
Trial Attorney